UNITED STATES, Appellee

v

SEEBIE SMITH, Private E-1, U. S. Army, Appellant

7 USCMA 102, 21 CMR 228

■■■■■■

103

. No. 7787

Decided June 1, 1956

*Captain Albert C. Malone, Jr.,* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley F. Flynn.*

*First Lieutenant Lewis W. Evans* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant James G. Duffy.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused, an Army private, was tried by a general court-martial and convicted of absence without leave and fraudulently making and using a paper writing for the purpose of obtaining payment of a claim, in violation of Articles 86, Uniform Code of Military Justice, 50 USC § 680, and 132, Uniform Code of Military Justice, 50 USC § 726. He was sentenced to dishonorable discharge, total forfeitures, and confinement for three years. The convening authority approved the findings and sentence, and a board of review affirmed. This Court granted review on the following two issues:

(1) Whether the law officer erred in permitting the Criminal Investigations Division agent to testify re-

garding the contents of the claim filed by the accused.

(2) Whether the law officer's ruling on the maximum sentence for Charge II was correct.

As both issues concern Charge II, only the facts bearing on that charge will be set forth. The record shows that the accused, on or about October 5, 1954, approached the master sergeant of the Overseas Replacement Station to which accused's unit was attached and inquired about an application for separate rations. As a result of the information received, he executed the necessary form in order to qualify for payment. On October 14, 1954, he was, by special order, authorized to receive separate rations and apparently received some payments. This order was

104

outstanding until January 19, 1955, and while the specification alleges no particular amount paid, the accused admitted receiving $33.00.

Under regulations then in effect, when permission to ration separately had been approved, an enlisted man received a monetary allowance of $1.10 per day in lieu of meals furnished by the service. However, during the authorized period, he was required to reimburse the Government for all meals consumed in Army messes. To be eligible for the ration payment, the enlisted man must have lived off the post with his family, and failure on the part of the accused to meet those requirements, after having affirmed that he was qualified, brought about this prosecution. The specification alleged that he made false statements in his application for rations, in that he asserted he was living with his wife at 246 Nelson Street, New Brunswick, New Jersey.

During the course of the investigation, the accused executed a written statement, in which he stated that he and his wife were married on June 18, 1954, and that they resided together in Newark, New Jersey, from November 17 to December 1, 1954. He further set out that they intended to live at the New Brunswick, New Jersey, address given in his application, but due to the high rent, they chose to reside in Newark, New Jersey. By way of explanation for the alleged falsity, he stated that he failed to change his address on his application, and forgot to terminate his separate rations when his wife left on December 1, 1954, until he moved back on the post on January 17, 1955. Later he orally admitted that he and his wife had not lived together during any of the period involved.

At the trial, the Government did not produce the original application for separate rations, but it proceeded to establish its case in the following way. A Criminal Investigations Division agent, Edward Kercheval, testified that he had investigated the alleged false claim filed by the accused, and that he had seen the original application, from which he had made a true copy. He was asked to testify to the contents of the original writing. Trial counsel had neglected to establish why the original document was not available, and when he sought to prove its contents by oral testimony, defense counsel framed his objections on the best evidence rule. To escape that objection, trial counsel insisted that the witness should be permitted to utilize the copy as a memorandum to refresh his recollection, and when that suggestion was advanced, the law officer overruled defense counsel's objection. Trial counsel, in attempting to pursue the subject, was unsuccessful in eliciting evidence to the effect that the witness could presently recall the statements set out in the original claim, and so the alleged copy was offered for admission. An objection to that document was sustained, and the witness was handed the document to read and refresh his memory. At this point he read to the court his copy of the claim verbatim. Defense counsel objected, this objection was sustained, the testimony was stricken, and the court was told to disregard the evidence read by the witness. Trial counsel was not to be discouraged, for he again requested the witness to read and refresh his recollection, and, after studying the document, the witness was requested to testify to its contents. There was no objection lodged against the last question asked, and the answer was permitted to stand.

II

The disposition of the first issue necessarily involves the doctrine of waiver. The Government contends defense counsel waived his objection on the best evidence rule for two reasons: First, he failed to object to the questions which elicited the damaging testimony. Second, he should not be permitted to raise the question because he affirmatively stated to the law officer that it was permissible for Agent Kercheval to refresh his memory from the copy. Paragraph 143a(1) of the Manual for Courts-Martial, United States, 1951, is quoted by the prosecution to support the contention that a failure to object results in a waiver, and United States v Deller, 3 USCMA 409, 12 CMR 165, is cited as support for the position that

this objection is one which can be waived by the mere failure to assert it.

We believe that it will simplify our approach to the issue if we briefly set out the rule of evidence in issue. For reasons which will appear, we need not discuss the principles governing the use of memoranda to refresh a person's memory and its closely allied concepts, for here the witness was precluded from testifying about the contents of the original or his self-composed copy until the Government had laid the base for use of secondary evidence. The proof necessary to support this offense had to do with the representations set out in the original application for separate rations, and not what might have been recorded in a purported copy made by the witness. The Government had to show that an application for separate rations was duly executed by the accused; that the paper writing was presented to the Government; that the separate rations were approved on the strength of the form; and that the claim contained information which was false in some material particular. The best evidence of the statements made would be the original writing. Paragraph 143*a* of the Manual, supra, at page 257, states the crux of the issue presented here as follows:

"(1) *General rule.*—A writing is the best evidence of its own contents, and the original thereof must be introduced to prove its contents. When this rule, known as the best evidence rule, applies, the proper method of proving the contents of a writing is to present evidence authenticating (143*b*) the original of the document and then to introduce the original in evidence."

The reason for this rule is aptly stated in Volume IV, Wigmore, Evidence, 3d ed, § 1179, page 318, as follows:

"These reasons are simple and obvious enough, as dictated by common sense and long experience. They may be summed up in this way: (1) As between a supposed literal copy and the original, the copy is always liable to errors on the part of the copyist, whether by wilfulness or by inadvertence; this contingency wholly disappears when the original is produced. Moreover, the original may contain, and the copy will lack, such features of handwriting, paper, and the like, as may afford the opponent valuable means of learning legitimate objections to the significance of the document. (2) As between oral testimony, based on recollection, and the original, the added risk, almost the certainty, exists, of errors of recollection due to the difficulty of carrying in the memory literally the tenor of the document."

There is a well-recognized exception to this rule which permits the admission of secondary evidence after a satisfactory explanation of the absence of the original writing has been shown. In this instance, testimony explaining the reason for not producing the original might have eliminated the issue which confronts us, but trial counsel did not seek to account for the whereabouts of that document. The law officer sought to put him on notice of the showing necessary to permit introduction of secondary evidence, but the warning went unheeded. Therefore, as a starting point, we find the record insufficient to support properly the use of that type of testimony.

The Government brief, in effect, concedes the principles briefly outlined above, but, as previously mentioned, it asserts they are immaterial in this instance because of a conscious waiver on the part of defense counsel. In support of that contention, the Government relies principally on United States v Deller, supra. In that case, we stated: "The Manual specifically requires an objection to 'secondary evidence' *as such*. Otherwise the objection is waived." We have no reason to retreat from that salutary holding, but in the instant case we believe the error was preserved for consideration on appeal. Defense counsel objected to the witness testifying to the contents of the original writing because of the best evidence rule and after a short colloquy the objection was overruled. When

trial counsel probed into the contents of the copy and sought to have it introduced, an objection which encompassed the same basic conception was sustained. Further inquiry into the use of memoranda resulted in the law officer and both counsel wandering off on a collateral matter. They became so involved with an issue concerning the use of memoranda to supply facts once known by the witness but now forgotten, or to refresh his memory, that they overlooked the underlying concept of the restricted use of secondary evidence. It was at this point that defense counsel made what the Government contends was a fatal admission concerning the competency of the evidence. However, as a result of the over-all defense tactics, the law officer was placed on notice of the defense claims of inadmissibility flowing out of the best evidence rule. Nevertheless, he eventually permitted the witness to use a prepared memorandum to refresh his memory and then, when the witness finally stated he could testify to its contents without reading it, his testimony was received. It is true that defense counsel did not interpose an objection to the last question, but his prior opposition to the admission of the evidence had been overruled, and he need not be captious about his objection. No doubt all participating parties became so concerned over the rules governing the use of memoranda that they did not consider carefully the concept underlying the original objection, but when the entire record of trial is considered, it is apparent defense counsel twice tried to prevent the reception of secondary evidence. The law officer was fully apprised of the defense position, for he stated in ruling on one objection, "The objection will be sustained as far as offering it into evidence as a memorandum; that is not to preclude its receipt in evidence upon proof that the original is gone or missing." Certainly this record establishes satisfactorily that, in the trial arena, the Government was asked to prove its case by competent evidence, and the opposition to the questioned evidence was not overcome by the law officer's announcement that the witness could testify to the statements in the original writing

if his own memorandum refreshed his memory and if his testimony was based on his revived recollection. Undoubtedly, had the defense counsel adopted the best practice, he should have reaffirmed his objection, but having been overruled previously by the law officer on the point in issue, he should not be charged with having waived his objection because he did not again challenge the law officer's ruling. We, therefore, conclude that the law officer erred, and, having resolved the first issue in that manner, it is not difficult to detail the way in which accused was substantially prejudiced by the error. When the record is stripped of Kercheval's inadmissible testimony, there remains no evidence that the accused ever made a claim against the Government, and the decision of the board of review must be reversed.

III

Because a rehearing can be ordered, Manual for Courts-Martial, United States, 1951, paragraph 92, page 159, and the second issue may become important on the retrial, we consider it advisable to set out our views. The law officer instructed the court that the maximum imposable sentence for both offenses was dishonorable discharge, total forfeitures, and confinement for six years. The maximum punishment for absence without leave is dishonorable discharge, total forfeitures, and confinement for one year. That fixed the maximum punishment for Charge II as dishonorable discharge, total forfeitures, and confinement for five years, and defense counsel insist the law officer erred when he so charged on that specification.

Article 132 of the Code, which defines the substantive offense, provides:

"Any person subject to this code—

(1) who, knowing it to be false or fraudulent—

(A) makes any claim against the United States or any officer thereof; or

(B) presents to any person in the civil or military service thereof, for approval or payment, any claim against the

United States or any officer thereof; or

(2) who, for the purpose of obtaining the approval, allowance, or payment of any claim against the United States or any officer thereof—

(A) makes or uses any writing or other paper knowing the same to contain any false or fraudulent statements; or

(B) makes any oath to any fact or to any writing or other paper knowing such oath to be false; or

(C) forges or counterfeits any signature upon any writing or other paper, or uses any such signature knowing the same to be forged or counterfeited; or

(3) who, having charge, possession, custody, or control of any money or other property of the United States, furnished or intended for the armed forces thereof, knowingly delivers to any person having authority to receive the same, any amount thereof less than that for which he receives a certificate or receipt; or

(4) who, being authorized to make or deliver any paper certifying the receipt of any property of the United States furnished or intended for the armed forces thereof, makes or delivers to any person such writing without having full knowledge of the truth of the statements therein contained and with intent to defraud the United States;

shall, upon conviction, be punished as a court-martial may direct."

In view of the specification, evidence, and instructions, we agree with counsel for the parties who con- ▮▮▮▮▮▮ cede that this prosecution is laid under subsection (2) (A). The Table of Maximum Punishments applicable to the entire Article is set up in two separate subdivisions, and to differentiate the provisions in the Table from those in the Article, in our further discussion we will refer to the former as a chart. The first division in the chart provides a max-

imum imposable sentence of dishonorable discharge and five years confinement for "Forging or counterfeiting a signature, or making a false oath in connection with a claim, and offenses related to either of these." The second category deals with "other cases" in which the maximum punishment is controlled by the amount involved, with sentences ranging from six months to five years confinement, just as in the case of larceny.

The ultimate question, then, is whether the offense alleged and proven falls within the "offenses related" provision found in the first clause of the chart, or should be grouped with the "other cases" mentioned in the second clause. It is to be noted that the punitive Article is divided into four groups of offenses. They are identified by appropriate numbers from (1) to (4). Group (2) is subdivided into three categories, but the grouping is such, and the gravamen of the offenses so similar, that we conclude they merely set out different methods of committing the same offense. When the same crime is defined in different ways, the punishment should not vary according to the manner of commission, and the President could not have intended to have a particular value control the punishment for the offense listed under (2) (A) and not have the same principle apply to subsections (2) (B) and (2) (C). A mere reference to the offenses defined in the two latter categories will establish convincingly that they involve either forgery, counterfeiting or a false oath for the purpose of obtaining the approval, allowance, or payment of any claim against the United States. While the crime defined in subsection (2) (A) may be said to be slightly different from those defined in the two other subsections, it certainly is clearly related to them, and, insofar as the breach of a duty to the Government is important, the three definitions stand on the same footing. Beyond question, the crimes prescribed in subsections (2) (B) and (2) (C) carry a maximum penalty of five years and we are satisfied the offense committed herein carries the same penalty.

The above interpretation appears to

be supported by the second subdivision set out in the chart, for it refers to "other cases" and the punishment is based on the amount involved. There seems to be a purpose in providing for a graduated punishment for offenses defined in subsections (3) and (4) of Article 132. The offenses defined in those categories approach more closely to the crime of larceny than do the offenses proscribed in the first two subsections. In classes (3) and (4), the offender can be characterized as stealing or embezzling from the Government, for he reflects in his records the payment of sums for which the Government did not receive adequate consideration, and the excess between the amount paid and that recorded as paid can be appropriated by the offender. The distinction between that form of illegal transaction and larceny is barely discernible, and the punishment to fit both ought to be founded on the same underlying principle.

For the foregoing reasons we conclude that the law officer correctly charged the court on the maximum sentence which could be imposed.

The decision of the board of review is affirmed as to Charge I and reversed as to Charge II. A rehearing may be ordered.

Chief Judge QUINN concurs.

Judge FERGUSON did not participate in the decision in this case.